# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| C.S., <br>                Plaintiff <br><br> vs. <br><br> SOUTHERN COLUMBIA AREA SCHOOL DISTRICT <br><br> and <br><br> JAMES A. BECKER <br>                Defendants | CIVIL ACTION NO. <br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, C.S., by and through her undersigned counsel Andreozzi & Associates, hereby brings the following Complaint before this Honorable Court and avers the following in support thereof:

## JURISDICTIONAL STATEMENT

1. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1343, which gives district courts original jurisdiction over any civil action to recover damages or to

secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

2. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), since all defendants reside in this district, and the events giving rise to the claims occurred in this district.

## PARTIES

3. The Plaintiff, C.S., is an eighteen year old female sexual assault survivor. Pursuant to Fed.R.Civ.P. 5.2(a)(3), C.S. utilizes her initials in pleadings because she was known to be a minor at the time that all causes of action detailed herein arose. C.S. was a student at Defendant Southern Columbia Area School District ("the School District") from August 2005 until October 2010.

4. The School District Defendant operates the Southern Columbia Area High School ("the High School"), which is a public school in the Commonwealth of Pennsylvania, and it receives federal funds for the operation of the school.

5. Defendant James A. Becker ("Principal Becker") is an adult individual residing in the Commonwealth of Pennsylvania, and, at all times relevant, he was the Principal of the High School and was acting with the authority of the School District and in his official capacity. Principal Becker had the authority to take

2

corrective measures based upon the presence of sexual harassment or a hostile educational environment.

## BACKGROUND

6. A.Z. and K.D. were the perpetrators of sexual assault upon C.S. Pursuant to Fed.R.Civ.P. 5.2(a)(3) Plaintiff utilizes A.Z. and K.D.'s initials in pleadings because they were known to be minors at the time that all causes of action detailed herein arose.

7. By all accounts, A.Z and K.D. were very popular students, who excelled both academically and athletically at the High School.

8. In the 2011-2012 football season, K.D. was the football team's star wide receiver leading the team in receptions, receiving yards, and receiving touchdowns. K.D was also a key member of the football team's defense, leading the team in solo tackles, interceptions, and forced fumbles. In addition, A.Z. and K.D. were members of the High School's basketball team, which was runner up in the 2011-2012 PIAA District IV and recently competed in the state championship tournament with a 20-5 record.

9. The High School has garnered a reputation as a football powerhouse and is a six time winner of the football state championship. According to the High

School's website "The Southern Columbia Tigers are one of the most successful football programs in Pennsylvania and one the best small-school programs in the country." The High School has won four consecutive PIAA District IV football championships.

10. As described in greater detail below, the School District has adopted and enforced a disciplinary system designed to protect and maintain athletic eligibility for its male athletes regardless of their criminal behavior and/or propensity for violence against female students. For example, shortly before the events which are set forth in this Complaint, a star athlete on the High School football team physically assaulted a female student by shoving her into a locker during an argument. The athlete was not meaningfully punished as a result of this assault, and he was able to continue to participate on the football team. It is believed and therefore averred that this type of reaction to the misbehavior of male athletes was common practice at the High School.

11. This is an action to redress a hostile educational environment and sexual harassment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a). This action also seeks recovery for violations of Title IX and the Equal Protection Clause pursuant to 42 U.S.C. §1983.

## FACTUAL HISTORY

12. C.S. incorporates the averments in paragraphs 1-11 above as if stated in full herein.

13. C.S. moved into the School District in 2005 and was enrolled as a student in the School District from August of 2005 until she was forced to leave in October 2010 as a result of sexual harassment and a hostile educational environment.

14. On July 13, 2009, C.S. was sexually assaulted by K.D. and A.Z. (collectively "the Perpetrators"). In summary, C.S. was lured to A.Z.'s bedroom, where K.D. was hiding in a closet. To C.S.'s surprise K.D. came out of the closet, and C.S. was held down on a bed against her wishes and sexually assaulted.

15. Criminal charges were brought against both of the Perpetrators shortly after the assault.

16. On August 24, 2009, C.S.'s parents contacted Principal Becker and arranged a meeting for the next day in an effort to ensure that C.S. would have a safe learning environment free of harassment.

17. During this meeting, C.S. and her parents formally notified school officials, including Principal Becker, of the criminal acts committed by the Perpetrators and discussed and requested, among other things, that the Perpetrators

be removed from the school, not placed in classes with C.S., and prevented from having contact with C.S.

18.     Officials for the School District, including Principal Becker, informed C.S. and her parents that they would take no action against the Perpetrators and that the School could do nothing to separate C.S. from the Perpetrators without a court order since the assault did not take place on school grounds. At no time during the meeting did the School District offer to assist or help procure a court order to protect C.S. from contact with the Perpetrators, nor did officials inform C.S. or her parents of her right to an education free of sexual harassment.

19.     During this meeting, when C.S. specifically raised concerns of being scheduled in the same "honors" English class as the Perpetrators, the School District refused to offer any reasonable accommodation to her. In fact, C.S. was advised that if she did not wish to be in the same "honors" English class as the Perpetrators her alternative was to remove herself from the "honors" class and schedule herself in the "general" class since there was only one section of "honors" English.

20.     After this meeting, since Principal Becker and School District officials made it clear that the School District would not remove the Perpetrators from her classes, C.S. timely obtained a No Contact Order from Judge Wiest of the Court of

Common Pleas of Northumberland County dated August 27, 2009 ordering "the [Perpetrators] may have no verbal or physical direct or indirect contact with [C.S.] nor may said child be on or in close or adjacent proximity to the residence or business property of [C.S.]." The order also provided that the "[School District] shall take appropriate steps to ensure that [the Perpetrators] and the victim will not be subject to contact via placement in the same homeroom, classroom, and bus."

21. Despite her best efforts, C.S. was unable to deliver the Court Order to the High School before the first day of school began. Since the School District refused to remove the Perpetrators from her classes or otherwise take any action against the Perpetrators, incredibly, C.S. was forced to encounter the Perpetrators in her homeroom and other classes throughout the day, sometimes sitting or walking just a few feet away.

22. The School District allowed this class placement despite the fact that the sexual assault had occurred just over a month ago, the Perpetrators had been charged criminally, and C.S. and her parents had pleaded for a safe and non-hostile educational environment.

23. Even after the No Contact Order was delivered to the High School, the Perpetrators remained in C.S.'s scheduled lunch period, and defiantly sat a few feet away from C.S. at her lunch table, in disregard of the No Contact Order and

C.S.'s education. True to form, the School District took no action to protect C.S. at lunch despite knowledge of the situation after C.S. voiced her concerns to Principal Becker and other school officials.

24. Although the School District never offered to create a new "honors" English class to accommodate C.S., who was told she could drop to "general" English if she wanted to be in an English class without the Perpetrators, the School District later decided to create an additional "honors" English period to accommodate the Perpetrators once the School District's hands were tied by the No Contact Order. To this end, the School District was willing to deprive C.S. of the opportunity to enroll in an advanced class, but was not willing to deprive its star male athletes of the same opportunity.

25. While the No Contact Order purportedly prevented C.S. from being in the same classroom as the Perpetrators, the School District failed to protect C.S. from harassing confrontations with other students and continued contact with the Perpetrators. C.S. was forced to endure rude comments and threats from friends of the Perpetrators, specifically instructing her that she better not do anything that could inhibit the Perpetrators' ability to participate in athletics.

26. C.S. relayed this information to Principal Becker and other school officials and sought further assistance and accommodation from the School District

to protect her from every day encounters and harassment from the Perpetrators. However, little was done, and Principal Becker and school officials continued to say that they could not take action without a Court Order.

27. The School District's blind eye forced C.S. to go back to Court on her own, and, on September 17, 2009, she was ultimately granted an Amended No Contact Order. The Amended No Contact Order required the School District to make special arrangements for lunch for the Perpetrators in a time and place separate from C.S. and also required the Perpetrators to report directly to their first period classes upon entering the school. Although the School District refused to intervene in this or any other legal matter that might benefit C.S., the School District and its employees did not hesitate to show up to the courthouse whenever they could be of assistance to the Perpetrators. In fact, the school's advocacy efforts on behalf of the Perpetrators began in the fall of 2009 when the school's athletic trainer appeared in court on behalf of K.D. to support his effort to have his ankle monitor removed so he would not be inhibited during football games.

28. In the weeks following the entry of the Amended No Contact Order, C.S. continued to endure harassing comments from her fellow students and further harassing encounters with the Perpetrators, which were in violation of the No Contact Order. Specifically, on separate occasions the Perpetrators sat directly

behind C.S. at a pep rally, made obscene sexual gestures to C.S.'s family at a school activity, and yelled at C.S. in the school's hallway. Students at the school also continued to make rude comments and threatened to cover her lunch table with newspaper articles about the assaults.

29. Although violations of the Order and the Perpetrators' misbehavior were reported to Principal Becker and the School District, no reasonable efforts were made to address the harassment, and the School District continued to reassert, and hide behind, the legally flawed position that no action could be taken absent a Court Order since the assault did not take place on school grounds. The School District took this position although it had a Title IX coordinator, its employees and agents had received Title IX training, and it specifically learned at this Title IX training that it could take action against student athletes who had committed a crime off of school grounds.

30. Even though the School District knew of its Title IX obligations, it had no policies or procedures in place to address student misconduct that occurred off premises, nor did it have adequate policies or procedures to address sexual harassment, and it used these inexcusable failures to protect its male star athletes.

31. Recognizing the School District's apparent failures, C.S. and her family requested that the School District make available for students and

employees a sexual assault awareness program which would be presented by Susquehanna Valley Women in Transition at no expense to the School District. The program would educate students and employees on issues including, but not limited to, sexual harassment and date rape.

32. Even though the program was free, would not be mandatory for students or employees, and was offered in the evenings during non-educational hours, the School District refused to allow the presentation of the program.

33. On December 10, 2009, A.Z. was adjudicated delinquent and dependent on the charge of Indecent Assault (Misdemeanor-1), even though School District employees testified in support of him during the criminal hearing.

34. On January 29, 2010, K.D. was adjudicated delinquent and dependent on the charges of Aggravated Indecent Assault (Felony-2), Sexual Assault (Felony-2) and Indecent Assault (Misdemeanor-2), even though School District employees testified in support of him during the criminal hearing.

35. Despite these adjudications, the School District did not take any action to discipline the Perpetrators, or prevent them from having contact with or harassing C.S., or otherwise restrict their ability to attend or participate in extra-curricular activities, and they were both allowed to play on the boys' basketball team that winter. The boys' permission to participate on the basketball team

resulted in the constructive deprivation of C.S to participate on the basketball team's cheerleading squad, as C.S. could not reasonably be expected to cheer for, and rally behind, two students who had recently sexually assaulted her.

36. In the spring of 2010, C.S. again sought to participate in an extra-curricular activity, the track team, and she notified school officials, including Principal Becker, of her desire to participate and sought to have the Perpetrators excluded from the team or restrict their ability to be near her during the activity. The school again refused to place any meaningful restrictions on the Perpetrators, and C.S. soon found one of the Perpetrators running directly behind her just a few feet away during a track practice. This traumatic experience forced C.S. to quit the team.

37. C.S.'s encounters with the Perpetrators continued through the end of the school year when one of the Perpetrators was scheduled to take a final exam in the same room as C.S. C.S. was shocked to find the Perpetrator in the room, and when she brought the issue to the School District employee's attention, she was told that if she wasn't comfortable with his being in the room then she would have to leave the room. This issue was brought to the attention of Principal Becker, and no further action was taken.

38.  The School District's blind support for the Perpetrators and deliberate indifference towards C.S. continued into the summer of 2010 when employees from the School District, including Principal Becker, came to K.D.'s disposition hearing to offer testimony in his support. This action came despite the fact that no School District employee had appeared to support C.S. in any of her legal proceedings. To the contrary, the wife of the head football coach, who just so happened to be C.S.'s cheerleading coach, previously appeared in court and offered testimony adverse to C.S.'s character.

39.  On the first day of the 2010-2011 school year, C.S. found A.Z. in her study hall, even though there had been multiple discussions with school officials regarding C.S.'s schedule. By this time, the entire school knew that A.Z. was not to be in any of C.S.'s classes. The school administrator who was responsible for class scheduling was the assistant football coach and track coach.

40.  The School District continued to create an environment that made it clear to all that it would favor and protect the Perpetrators at every turn to the detriment of C.S.'s education. The final straw came on August 30, 2010 when the School District solicitor intervened in a legal matter to assist K.D. in amending the No Contact Order so he could gain flexibility for his lunch schedule.

41. In light of the non-stop harassing encounters with the Perpetrators and classmates, as well as the School District's unabashed support for the Perpetrators, the hostile environment at the High School became unbearable for C.S., and she was forced to withdraw from the High School. She ultimately enrolled in cyber school after the School District refused to support her effort to transfer to a local high school.

## VIOLATION OF TITLE IX, 20 U.S.C. §1681

42. Paragraphs 1-41 of the Complaint are incorporated by reference as if stated in full herein.

43. The School District created and/or permitted to continue sexual harassment and hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a). C.S. was subjected to quid pro quo sexual harassment and a sexually hostile educational environment, School District officials who had the authority to take corrective measures had actual notice of the harassment and hostile environment, but were in fact deliberately indifferent to the harassment and hostile environment.

44. C.S. has suffered severe and permanent psychological damage, emotional distress, and decreased educational opportunities as a direct and proximate result of the School District's violations of her rights under Title IX.

**WHEREFORE**, Plaintiff demands that judgment be entered in her favor and against the School District for compensatory damages, punitive damages, interest, costs, and attorney fees.

## VIOLATION OF 42 U.S.C. §1983

45. Paragraphs 1-44 of the Complaint are incorporated by reference as if stated in full herein.

46. C.S. had the right to equal protection of the laws and an educational environment that was free from sexual harassment pursuant to the Fourteenth Amendment to the United State Constitution and Title IX.

47. Defendants, while acting under color of state law, violated these rights and unlawfully discriminated against C.S. and subjected C.S. to disparate treatment based upon her gender.

48. Defendants implemented a policy, pattern, custom, and practice of preferential treatment geared towards male athletes with deliberate indifference towards female students, such as C.S., and this policy, pattern, custom, and practice proximately caused a violation of C.S.'s constitutional rights to equal access to an education, and an education free of sexual harassment and a non-hostile educational environment.

49. C.S. has suffered severe and permanent psychological damage, emotional distress, and decreased educational opportunities as a direct and proximate result of the School District's violations of equal protection and Title IX rights in violation of 42 U.S.C. §1983.

**WHEREFORE**, Plaintiff demands that judgment be entered in her favor and against the School District and James A. Becker for compensatory damages, punitive damages, interest, costs, and attorney fees.

Date: 5/30/12

Respectfully Submitted,
ANDREOZZI & ASSOCIATES, P.C.

By:
*Benjamin D. Andreozzi*

Benjamin D. Andreozzi
Attorney ID #89271
Heather E. Verchick
Attorney ID #201310

215 Pine St., Ste. 200
Harrisburg, PA 17101
Phone - (717) 525-9124
Fax - (717) 525-9143
Counsel for Plaintiff

Ben@midstatelaw.com
Heather@midstatelaw.com