UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

C.S.,                                    : **CIVIL NO: 4:12-CV-1013**
                                         :
                Plaintiff                :
                                         : (Judge Conner)
        v.                               :
                                         : (Magistrate Judge Arbuckle)
SOUTHERN COLUMBIA AREA                   :
SCHOOL DISTRICT, *et al.,*                :
                                         :
                Defendants               :

## REPORT AND RECOMMENDATION

The plaintiff, who was a high school student at the relevant time, contends that the defendants—a School District and a High School Principal—subjected her to a hostile educational environment by refusing to take meaningful steps to prevent two of her classmates who had sexually assaulted her from being in close contact with her and by refusing to take meaningful steps to prevent them and their friends from harassing her. The defendants filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. For the following reasons, we recommend that the motion be granted in part and denied in part.

I. Background.

The plaintiff, C.S., began this action by filing a complaint naming the Southern Columbia Area School District and James A. Becker, the Principal of the Southern Columbia Area High School, as defendants.

A. Allegations in the Complaint.[1]

C.S. alleges the following facts in her complaint, which we accept as true for the purposes of this motion.

The Southern Columbia Area School District operates the Southern Columbia Area High School and receives federal funds for the operation of the school. C.S. attended the Southern Columbia Area School District from August of 2005 until October of 2010. K.D. and A.Z.—star male athletes and very popular

_____

1. Because we are addressing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), we set forth the facts pleaded in the complaint, but we have disregarded legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

students—also attended the Southern Columbia Area School District.

The School District has adopted and enforced a disciplinary system designed to protect and maintain athletic eligibility for its male athletes regardless of their criminal behavior or propensity for violence against female students. For example, a star football player physically assaulted a female student by shoving her into a locker during an argument. The School District did not meaningfully punish him, and it allowed him to continue to play on the football team. It was a common practice at the High School not to meaningfully punish male athletes for their misbehavior.

In July of 2009, K.D. and A.Z. sexually assaulted C.S. More specifically, they lured C.S. to A.Z.'s bedroom, where unbeknownst to her K.D. was hiding in the closet. To C.S.'s surprise, K.D. came out of the closet, held her down on the bed against her wishes, and sexually assaulted her. Shortly after the assault, criminal charges were brought against K.D. and A.Z.

On August 25, 2009, C.S.'s parents met with Principal Becker in an effort to ensure that C.S. would have a safe learning environment free of harassment. During this meeting, C.S. and her parents notified school officials of the criminal acts committed by K.D. and A.Z, and they requested, among other things, that the School District remove K.D. and A.Z. from school, not place them in classes with C.S., and prevent them from having contact with C.S. School officials including Principal Becker, who had the authority to take corrective measures, told C.S. and her parents that they would take no action against K.D. and A.Z and that the school could do nothing to separate K.D. and A.Z. from C.S. because the assault had not taken place on school grounds. The School District did not offer to assist in procuring a court order to protect C.S. from contact with K.D. and A.Z. Nor did it inform C.S. or her parents of her right to an education free of sexual harassment. And when C.S. raised concerns about being scheduled in the same "honors" English class as K.D. and A.Z., the School District refused to offer her any reasonable accommodation. Instead, it advised her that there is only one section of "honors" English and that if she did not wish to be in the same class as K.D.

and A.Z., she should remove herself from the class and enroll in the "general" English class.

Because Principal Becker and school officials made it clear that they would not remove K.D. and A.Z. from C.S.'s classes, on August 27, 2009, C.S. obtained a No Contact Order from Judge Wiest of the Court of Common Pleas of Northumberland County. That Order provided that K.D. and A.Z. "may have no verbal or physical direct or indirect contact" with C.S. and that they may not "be on or in close or adjacent proximity to the residence or business property" of C.S. It also provided that the School District "shall take appropriate steps to ensure that [the Perpetrators] and the victim will not be subject to contact via placement in the same homeroom, classroom, and bus."

Despite her best efforts, C.S. was unable to deliver the No Contact Order to the High School before the first day of school. And because the School District refused to take any action, C.S. encountered K.D. and A.Z. in her homeroom and other classes throughout the day, sometimes sitting or walking just a few feet away from them.

Even after C.S. delivered the No Contact Order to the High School, K.D. and A.Z. remained in the same lunch period as C.S., and they sat a few feet away from her at her lunch table in defiance of the No Contact Order. The School District took no action to protect C.S. at lunch even after she voiced her concerns to Principal Becker and other school officials.

While the School District would not create a new "honors" English class to accommodate C.S. when she had initially raised concerns about being in the class with K.D. and A.Z., after the School District's hands were tied by the No Contact Order they created an additional "honors" English class to accommodate K.D. and A.Z. Although the School District had been willing to deprive C.S. of the opportunity to enroll in an advanced class, it was not willing to deprive its star male athletes of such an opportunity.

Even after the No Contact Order, the School District failed to protect C.S. from continued contact with K.D. and A.Z. and from harassing confrontations with other students. K.D. and A.Z.'s friends made rude comments and threats to C.S., instructing her not to do anything that could inhibit K.D. and

A.Z.'s ability to participate in sports.  C.S. relayed this
information to Principal Becker and other school officials and
sought assistance and accommodations to protect her from
everyday encounters and harassment from the perpetrators.  But
Principal Becker and school officials did little, and they
continued to say that they could take no action without a court
order.

So C.S. was forced to go back to court, and on,
September 17, 2009, the court entered an Amended No Contact
Order.  That Order required the School District to make special
arrangements for lunch for K.D. and A.Z. separate from C.S.  It
also required K.D. and A.Z. to report directly to their first
period classes upon entering the school.

In the weeks following the entry of the Amended No
Contact Order, C.S. continued to endure harassing comments from
her fellow students and further harassing encounters with K.D.
and A.Z.  More specifically, on separate occasions K.D. and
A.Z. sat directly behind C.S. at a pep rally, they made obscene
sexual gestures to C.S.'s family at a school activity, and they
yelled at C.S. in the school's hallway.  Other students also

continued to make rude comments to C.S. and threatened to cover her lunch table with newspaper articles about the assault.

C.S. reported the violations of the No Contact Order and the perpetrators' misbehavior to Principal Becker and the School District, but they failed to take any reasonable measures to address the harassment. And the School District continued to assert that it could take no action absent a court order because the assault had not taken place on school grounds. The School District took this position even though it had a Title IX coordinator, its employees and agents had received Title IX training, and it had specifically learned at that training that it could take action against student athletes who committed a crime off of school grounds. Even though the School District knew of its Title IX obligations, it had no policies or procedures in place to address student misconduct that occurred off premises, it had inadequate policies and procedures to address sexual harassment, and it used these failures to protect its star male athletes.

C.S. and her family requested that the School District make available to students and employees a sexual assault

awareness program presented by Susquehanna Valley Women in
Transition at no expense to the School District.  The program
would educate students and employees about issues such as
sexual harassment and date rape.  Even though the program would
be free, would not be mandatory for students or employees, and
would be offered in the evenings during noneducational hours,
the School District refused to allow Susquehanna Valley Women
in Transition to present the program.

Although School District employees testified in support
of A.Z. and K.D. during the criminal hearings, in December of
2009, the juvenile court adjudicated A.Z. delinquent and
dependent on a charge of Indecent Assault (a Misdemeanor 1),
and, in January of 2010, it adjudicated K.D. delinquent and
dependent on charges of Aggravated Indecent Assault (a Felony
2), Sexual Assault (a Felony 2), and Indecent Assault (a
Misdemeanor 2).

Despite these adjudications, the School District still
failed to discipline K.D. and A.Z., failed to prevent them from
having contact with or harassing C.S., and failed to restrict
their ability to attend and participate in extracurricular

activities.  In fact, it allowed them to play on the boys'
basketball team that winter, and as a result it deprived C.S.
of the opportunity to participate on the basketball team's
cheerleading squad because she could not reasonably be expected
to cheer for students who had recently sexually assaulted her.
In the spring of 2010, C.S. notified Principal Becker and
school officials of her desire to participate in the track
team, and she sought to have K.D. and A.Z. excluded from the
team or to restrict their ability to be near her during the
activity.  The school again refused to place any meaningful
restrictions on K.D. and A.Z., and C.S. soon found one of them
running just a few feet behind her during track practice.  This
traumatic experience forced C.S. to quit the track team.

One of the perpetrators was scheduled to take a final
exam in the same room as C.S.  Shocked to find him in the room,
C.S informed a school employee, who told her that if she was
not comfortable she would have to leave the room.  The issue
was brought to the attention of Principal Becker, but he took
no action.

Although the School District refused to intervene in any legal matters that might benefit C.S., School District employees showed up to the courthouse whenever they could be of assistance to K.D. and A.Z. For example, in the fall of 2009, the school's athletic trainer appeared in court on behalf of K.D. to support his effort to have his ankle monitor removed so that it would not inhibit him during football games. In the Summer of 2010, School District employees including Principal Becker came to the disposition hearing of K.D. to offer testimony in his support. In contrast, the cheerleading coach, who was the wife of the head football coach, appeared in court and offered unfavorable testimony about C.S.'s character.

C.S. continued to encounter problems in the 2010-2011 school year. On the first day of school, she found A.Z. in her study hall even though by this time the entire school knew that A.Z. was not allowed in any of her classes and there had been multiple discussions with school officials regarding C.S.'s schedule. The assistant football coach and track coach was the school administrator responsible for class scheduling.

On August 30, 2010, the School District Solicitor intervened in a legal matter to assist K.D. in amending the No Contact Order so that he could gain flexibility for his lunch schedule. C.S. characterizes this as the "final straw." Because of the nonstop harassing encounters with K.D. and A.Z. and classmates as well as the School District's unabashed support for K.D. and A.Z., the environment at the High School became unbearable for C.S., forcing her to withdraw from the High School. She ultimately enrolled in cyber school after the School District refused to support her efforts to transfer to another local high school.

B.   Claims and Procedural History.

C.S. claims that the School District violated Title IX. In that regard, she claims that the School District subjected her to quid pro quo sexual harassment and a sexually hostile educational environment. She claims that School District officials who had authority to take corrective action had actual notice of the harassment and hostile environment, but they were deliberately indifferent to the harassment and

hostile environment.  C.S. also claims that the School District and Principal Becker violated the Equal Protection Clause of the Fourteenth Amendment by unlawfully discriminating against her and subjecting her to disparate treatment based upon her gender.  In that regard, she claims that the defendants implemented a policy, pattern, custom, and practice of preferential treatment of male athletes with deliberate indifference toward female students and that this violated her rights to equal access to an education, to an education free of sexual harassment, and to a nonhostile educational environment. She claims that she suffered severe and permanent psychological damage, emotional distress, and decreased educational opportunities as a result of the defendants' actions.  She seeks compensatory and punitive damages as well as interest, costs, and attorney fees.

The defendants filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).  The parties have fully briefed that motion, and it is ripe for decision.

II.  Motion to Dismiss Standard.

A motion to dismiss a complaint for failure to state a claim upon which relief can be granted brought pursuant to Fed.R.Civ.P. 12(b)(6) challenges the legal sufficiency of the plaintiff's complaint.  In deciding a motion to dismiss the complaint, we must accept all well-pleaded factual allegations as true, "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *McTernan v. City of York,* 564 F.3d 636, 646 (3d Cir. 2009)(quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009).  The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Detailed factual allegations are not required. *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  But more is required than labels, conclusions, and a formulaic recitation of the elements of a cause of action.  *Id.*  "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir. 2009).  "A complaint has to "show" such an entitlement with its facts." *Id.*  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft, supra,* 556 U.S. at 679.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft, supra,* 556 U.S. at 678 (quoting *Twombly*, *supra,* 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than

a sheer [sic] possibility that a defendant has acted unlawfully." *Id.* "[A] complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer,* 131 S.Ct. 1289, 1296 (2011). Rule 8(a)(2) "requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Id.* The factual detail necessary to satisfy the standard will vary depending on the case. *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 320 n.18 (3d Cir. 2010).

III. Discussion.

C.S. asserts claims under Title IX and the Equal Protection Clause. We address each in turn.

A. Title IX—Statutory Background.

Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial assistance." Although Title IX does not expressly provide for a private right of action, the Supreme Court has recognized an implied right of action to enforce its provisions. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 717 (1979). And the Court has held that damages are available in such an action. *Franklin v. Gwinnett Cnty. Pub. Schs.,* 503 U.S. 60, 76 (1992). But the Court has rejected *respondeat superior* or constructive notice as a basis for liability under Title IX. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 285 (1998). Rather, "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 640 (1999). And only the recipient of federal funds may be liable. *Id.* at 641.[2]

"To succeed on a Title IX sexual harassment claim, a student must show: (1) quid pro quo sexual harassment, or a sexually hostile educational environment; (2) actual notice by an 'appropriate person' who has the authority to take

_____

[2]. Principal Becker contends that the Title IX claims against him should be dismissed because Title IX does not provide for individual liability. In response, C.S. clarifies that she is not suing Principal Becker under Title IX. (Doc. 11 at 25).

corrective measures; and (3) a response to the harassment that amounts to deliberate indifference." *E.N. v. Susquehanna Twp. Sch. Dist.,* Civil Action No. 1:09-CV-1727, 2010 WL 4853700 at *14 (M.D. Pa. 2010).

B. The Complaint Fails to State a Title IX Claim Upon Which Relief Can Be Granted for Quid Pro Quo Sexual Harassment.

To establish a quid pro quo sexual harassment claim, C.S. must show: "(1) that she belongs to a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; and (4) that a tangible educational action resulted from her refusal to submission to or rejection of the sexual harassment." *E.N., supra,* 2010 WL 4853700 at *14.

The School District contends that the complaint fails to state a claim for quid pro quo harassment because the facts alleged in the complaint simply do not support such a claim. C.S. responds that she has pleaded sufficient facts to support a sexually hostile environment claim and that, therefore, she

18

need not establish quid pro quo sexual harassment.  It appears

that C.S. is waiving any quid pro quo claim.  But because the

complaint explicitly mentions quid pro quo, we will recommend

that any such claim be dismissed because such a theory is

simply not applicable to the facts of this case.


   C. The Complaint States a Claim Upon Which Relief Can
      Be Granted for a Hostile Educational Environment.


    The Court has held that in certain limited

circumstances a Title IX action may lie for student-on-student

sexual harassment. *Davis, supra,* 526 U.S. at 633.  But "funding

recipients are properly held liable in damages only where they

are deliberately indifferent to sexual harassment, of which

they have actual knowledge, that is so severe, pervasive, and

objectively offensive that it can be said to deprive the

victims of access to the educational opportunities or benefits

provided by the school." *Id.* at 650.  To establish a student-

on-student hostile education environment claim, a plaintiff

must show that "(1) the defendant received federal funds; (2)

sexual harassment occurred; (3) the harassment took place under

circumstances wherein the funding recipient exercised

substantial control over both the harasser and the context in which the harassment occurred: (4) the funding recipient had actual knowledge of the harassment; (5) the funding recipient was deliberately indifferent to the harassment; and (6) the harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived the victims of access to the educational opportunities or benefits provided by the school." *Yan Yan v. Penn State Univ.,* No. 4:10-CV-212, 2012 WL 3201888 at *6 (M.D. Pa. Aug. 3, 2012)(quoting *Dawn L. v. Greater Johnstown Sch. Dist.,* 586 F.Supp.2d 332, 365 (W.D.Pa. 2008)).

A recipient of federal funds cannot be liable for harassment unless "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis, supra,* 526 U.S. at 645. But, "recipients of federal funding may be liable for 'subject[ing] their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Id.* at 646.

Applying these principles, the School District cannot be liable for the sexual assault that occurred during the summer and off of school property. But C.S. does not seek to hold the School District liable for that assault. Rather, she seeks to hold the School District liable on the basis that it subjected her to a sexually hostile environment because she was forced to attend the same school as her attackers and to encounter them on a regular basis and because they and their friends verbally harassed her.

The School District contends that the complaint fails to state a hostile educational environment claim upon which relief can be granted because the complaint fails to allege facts that show that C.S. suffered intentional discrimination because of her sex or that show that the alleged discrimination was severe, pervasive, and objectively offensive.

C.S. alleges numerous encounters with K.D. and A.Z. at school: they sat at her lunch table, they sat directly behind her at a pep rally, they yelled at her in the hallway, one of them was in the same room with her during a final exam, one of them was in her study hall, and one of them ran directly behind

her during track practice.  C.S. also alleges that K.D. and
A.Z.'s friends harassed her with threats that she better not do
anything to affect K.D. and A.Z.'s ability to play sports.
According to C.S., because of the environment at the school,
she quit the track team and eventually left the High School.

Sexual harassment is a form of discrimination. *Davis*,
*supra,* 526 U.S. at 649-50.  "Whether gender-oriented conduct
rises to the level of actionable 'harassment' . . .  'depends
on a constellation of surrounding circumstances, expectations,
and relationships, including, but not limited to, the ages of
the harasser and the victim and the number of individuals
involved." *Davis, supra,* 526 U.S. at 651 (citations omitted).
In other words, context matters.  Thus, what may not amount to
sexual harassment in one circumstance may amount to sexual
harassment in another. See *Doe v. East Haven Bd. of Educ.,* 200
F.App'x. 46, 48 (2d Cir. 2006) ("Although we recognize that
name-calling in school which implicates a student's sex does
not itself permit an inference of sex-based discrimination, . .
. we cannot exclude the possibility that such name-calling in
the context of a reported rape constitutes sexual
harassment.").

The context in this case is that C.S. had to endure numerous contacts with two students who had sexually assaulted her. Absent the sexual assault, those contacts would not be considered sexual harassment. But in light of the sexual assault, we cannot say as a matter of law that those contacts and the threats from the perpetrators' friends do not amount to sexual harassment.

The School District characterizes C.S.'s encounters with K.D. and A.Z. as random, infrequent, short, and objectively harmless. But construing the complaint in the light most favorable to C.S., as we must when deciding a motion to dismiss, we cannot say as a matter of law that the encounters were not severe, pervasive, or objectively offensive or that they did not deprive C.S. of access to the educational opportunities and benefits provided by the school. *See Doe v. Coventry Bd. of Educ.,* 630 F.Supp.2d 226, 233 (D.Conn. 2009)(holding that fact that victim of sexual assault and her attacker attended school together could be found to constitute pervasive, severe, and objectively offensive harassment so as to deny victim of equal access to school resources and opportunities); *Doe v. Derby Bd. of Educ.,* 451 F.Supp.2d 438,

444 (D.Conn. 2006)(holding that evidence that perpetrator of sexual assault that occurred during the summer and off of school grounds was permitted to attend school in the same building as his victim "leaving open the constant potential for interactions between them" and where victim saw perpetrator frequently during the school year and perpetrator's friends harassed her on several occasions "could support a reasonable jury conclusion that these circumstances rose to the level of 'severe, pervasive, and objectively offensive' under *Davis.*"); *Kelly v. Yale Univ.,* Civil Action No. 3:01-CV-1591 (JCH), 2003 WL 1563424 (D.Conn. Mar. 26, 2003)("The court agrees that a reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university.").

The School District contends that it had no legal authority to discipline or expel K.D. and A.Z. for their actions that occurred during the summer and off of school property and that the mere fact that it permitted all three students to attend the High School is not sufficient to state a

valid Title IX claim.  But whether the School District had the authority to discipline or expel A.Z. and K.D.,[3] after it received notice of the harassing conduct—and in the circumstances of this case requiring C.S. to have contact with her attackers can be seen as harassing conduct—it had a remedial duty under Title IX to take some action to try to prevent further harassment of C.S.  "Although a victim of peer harassment does not have right to any particular remedial demand, immediate expulsion of her alleged harasser, or a remedy that would expose the school to a constitutional or statutory claim on the part of the accused, Title IX requires that the school make an effort to remedy known peer harassment in a manner that is not 'clearly unreasonable.'" *Kelly v. Yale Univ.,* Civil Action No. 3:01-CV-1591 (JCH), 2003 WL 1563424 (D.Conn. Mar. 26, 2003)(quoting *Davis, supra,* 526 U.S. at 648). C.S. alleges that the School District's efforts in this regard were minimal.  Viewing the allegations in the light most favorable to C.S., we conclude that complaint states a Title IX

---

3.  The parties dispute the School District's authority to discipline A.Z. and K.D.  They each cite cases dealing with whether a school violates the First Amendment by punishing a student for his or her off-campus speech. We find those cases inapposite because this case is not a free speech case.

hostile educational environment claim upon which relief can be granted against the School District.

### D. The Complaint States an Equal Protection Claim Upon Which Relief Can Be Granted.

"Under the Fourteenth Amendment, no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Shuman v. Penn Manor School Dist.,* 422 F.3d 141, 151 (3d Cir. 2005)(quoting U.S. Const. amend. XIV, §1). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Id.* "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia,* 533 F.3d 183, 203 (3d Cir. 2008)(quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)). In order to establish an equal protection violation, a plaintiff must show an intentional or purposeful discrimination. *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985). "Discriminatory intent 'implies that the decision-maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse

effects upon an identifiable group.'" *Antonelli v. New Jersey,*
419 F.3d 267, 274 (3d Cir. 2005)(quoting *Personnel Adm'r of
Mass. v. Feeney,* 442 U.S. 256, 279 (1979)).

The defendants contend that the complaint fails to
state an equal protection claim upon which relief can be
granted because it does not contain allegations that C.S. was
treated differently than similarly situated individuals.  They
contend that to state a viable equal protection claim C.S.
would have to allege that a similarly situated male was
sexually assaulted off campus and subsequently received better
treatment than she did.  While the defendants recognize that
C.S. alleges that male athletes were given preferential
treatment as compared to female students, they argue that male
athletes and female students are not alike in all relevant
aspects.

In response, C.S. contends that she has alleged that as
a female student she was treated differently than A.Z. and
K.D., who are male students.  She requested an accommodation
for the "honors" English class, but this request was denied.
But the School District later created an additional "honors"

English claim to accommodate A.Z. and K.D.  She also asserts
that she has alleged that the School District has a pattern of
treating male students, specifically star male athletes,
differently than female students.  And she contends that male
student athletes are not a separate class of people whom the
government can treat differently than female students.

At this early stage of the litigation, we must construe
the complaint in the light most favorable to C.S., and doing
so, we conclude that it states an Equal Protection claim upon
which relief can be granted.


    E. C.S. has Withdrawn her Request for Punitive Damages
       from the School District and from Principal Becker
       in His Official Capacity.


The defendants argue that the claims for punitive
damages against the School District and against Principal
Becker in his official capacity should be dismissed.  In
response, C.S. asserts that she agrees to withdraw her claims
for punitive damages against the School District. (Doc. 11 at
5, n.1).  Although it is not clear that Principal Becker was

sued in his official capacity, to the extent that he was a claim against him in his official capacity is really a claim against the School District. So we assume that C.S. is also agreeing to withdraw the request for punitive damages against Principal Becker in his official capacity. Similarly, since she has not addressed the issue in her brief, we assume that C.S. agrees that any claim against Principal Becker in his official capacity merges with the claim against the School District, as the defendants have argued.

IV. Recommendations.

Accordingly, for the foregoing reasons, it is recommended that the defendants' motion (doc. 9) to dismiss the complaint be granted in part and denied in part. It is recommended that any Title IX quid pro quo claim be dismissed. It is recommended that the motion to dismiss be denied in all other respects. Finally, it is recommended that the case be remanded to the undersigned for further proceedings.

**NOTICE REGARDING OBJECTIONS**

The parties are further placed on notice that **pursuant to F.R.C .P 72 and Local Rule 72.3: Any party may object** to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) **within fourteen (14) days** after being served with a copy thereof. **Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections** which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. **The briefing requirements set forth in Local Rule 72.2 shall apply.** A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Respectfully submitted this 19th day of November, 2012.

*S/William I. Arbuckle, III*
William I. Arbuckle, III
U.S. Magistrate Judge